Everything is fine. It's a little cooler now. I don't need to work anymore. Good morning, Ms. Visner. Good morning, Your Honors. Judith Meisner representing Wilfredo Rosario Camacho. This is a multi-defendant appeal, and I will be addressing the issues relating to the public trial and prosecutorial misconduct. I'd like to reserve five minutes of my time for rebuttal, if I might. Yes, please. Thank you. The other attorneys will be addressing the other arguments that have been presented in the briefs. In this case, the right to a public trial that's at issue has two aspects. The closure during the jury selection process, which was a complete closure, which is reviewed under a plain error standard of review. And then a closure during closing arguments, which was a partial closure, the exclusion of Mr. Rosario's sister from the courtroom. And that was objected to and is under a de novo standard. The facts concerning the closure during jury selection were developed at a post-trial hearing pursuant to Rule 10e. Ms. Meisner, could you just get into the court found that there was no closure during the jury selection? And we submit that that finding is fairly erroneous. If you look at going through the testimony that was presented at the 10e hearing, you had the court security officer who testified, Deputy U.S. Marshal, four people who had attempted to get into the courtroom and were excluded, and the five attorneys who represented the defendants at trial. The court security officer testified that he was at the door at various times when members of the jury pool were dismissed, that the court doors were closed and that they were opened either by the Deputy U.S. Marshal or him as people left. We're not arguing or saying that the court ordered a closure. The court found that he didn't, and we are not contesting that. I understand it was the lawyer that ordered the closure in Hawaii. He told his client that there was a rule in the court that excluded the fact that there wasn't any order. No, there was no order from the court or a direct order from anybody. It was the practice of the courts. That's what the lawyers said. The lawyers said that, and I suggest that's also supported by the statement of the Assistant U.S. Attorney during the discussion at trial later, whether Ms. Rodriguez should be excluded or had been excluded. That's a different issue. Yes, it is. It is what's first. Yes, but at that time, the Assistant U.S. Attorney, in discussing Pressley, which had come down, I believe, the day the trial started, distinguished Pressley from the situation that they were addressing in terms of the partial closure and said that, described Pressley as a process similar to what's done in Puerto Rico. During voir dire, everyone is excluded. So I suggest that it's not only the defense attorneys who testified that this was the practice for as long as they could remember, but verified by the Assistant U.S. Attorney that this was the practice in Puerto Rico. When did this practice allegedly start? Well, Attorney Doltz testified that it had been going on since he started practicing in the 70s. He tried a lot of cases before me, and I don't remember any of that rule. That's not evidence, however. Are they alleging that it was the practice in all of the district courts in Puerto Rico or just with some judges? The testimony was that it was the general practice in the district courts in Puerto Rico to close the courtroom, to exclude members of the public during the jury selection process. And the Deputy Marshal and the CSO testified that their testimony confirms it in that they said, if there was a special request, then members of the defendant's family were, some judges allowed members of the defendant's family in if there was a special request. If you need a special request in order to come in, that, I think, also suggests that the general practice was that the courtroom was not open to the public during jury selection. Well, you know, I'm sorry to come back to this point, but wasn't it the lawyer that told him not to go in because of this? No, in one instance, the lawyer told, I believe it was Ms. Rosa, that she could not go in. But I think for the other people who tried to get in, there were courtroom personnel who they couldn't give a name or a precise description, but that they tried to get in and were told by courtroom personnel that they could not come in. All right. These were confirmed. Some of them then had conversations with the attorneys afterwards. All right. There was a hearing on this issue. Yes, there was. The court made findings of fact. The court made a finding of fact. And it found that the courtroom doors were never locked during jury selection process and that the public was not excluded from the courtroom due to court order or a determination by the deputy marshals. That's a finding of fact. It is. And I'm saying we're not contesting the courtroom not locked portion. And we're not contesting the judge's finding that he did not personally order, in this case, the courtroom to be closed. We are contesting, as clearly erroneous, the finding that the deputy U.S. marshal did not close the courtroom. Excuse me. On that point, so are you asking us to conclude that the trial court's credibility determination on that issue was erroneous because the district court is very explicit and basically believes the court officers and doesn't believe anybody else? So you're asking us to say that that credibility determination by the district court was clearly erroneous? I'm saying that the court, as to the court's specific statement, I believe the court officers and the deputy U.S. marshal was made in connection with the testimony about a piece of paper being put in the window at some point in time. And the focus here, I think, is before that. And what the judge ignored was the testimony of the deputy marshal that at some point, he testified, that at some point he told members of the public, including the family and friends of the defendants who were attempting to look through the windows, to move away from the door. They couldn't come in. He told them not to look through the windows. But he told them to move away from the door. He didn't tell them they could come in. Well, he told them to move away from the door. Yes. He didn't tell them not to come in. Which, to any person standing at the door, looking in, trying to get in, having been told that they could not come in, and the judge didn't say that the people were not told that they could not come in. He found that they did not come in because they were told by the attorneys and not as a result of any conduct by the court personnel. And I'm suggesting that the deputy marshal's testimony about telling people to move away from the door is telling them that they can't come in. Counsel, isn't your position that whether, in this specific trial, a judge ordered the courtroom closed or whether a court officer, pursuant to the court officer's understanding of the general policy, was keeping the doors closed? That really doesn't matter. I understand your position to be that this evidentiary hearing would support a conclusion that there was a longstanding, well-understood practice here in Puerto Rico that during the voir dire process, no member of the public goes into the courtroom. And the judge understood that, so there was no need to order it in this case. The court officers understood that, and to the extent that somebody would try to get in, they would keep them out. But it's that longstanding policy, understood by the attorneys as well, that's the problem here, isn't it? Well, that underlies, that caused the problem. We are saying that here, in this case, there was, in fact, an exclusion of members of the public by the court personnel and not simply from the instructions or advice of counsel, that the court personnel told them they could not come in. That was confirmed to them by the attorney. So for you to prevail here, we would have to conclude that, contrary to what the district court found, in this case, a court officer was acting to exclude members of the public? Yes, that there was, in this case, an exclusion. And I believe that Deputy Portolatin's testimony supports the testimony of four people who said, we came, we tried to get in, we were told we could not come in. Can I ask you something related to that? My understanding was that originally, at least, the courtroom was filled with prospective jurors. There was no room to sit down anybody else. Am I correct? The courtroom was full at the beginning, but jurors were excused, potential jurors were excused, and people were still kept in. And in terms of whether the courtroom was full or not, a closure, as this court first said in Owens and then Pressley and Augusta Vega, there are criteria that have to be met before a closure is constitutionally permissible. And you have to have an overriding interest. You have to have a closure that's no broader than necessary. You have to have a consideration of reasonable alternatives by the court, whether they're proposed by the defense or not. And you have to have adequate findings to support the closure. And in this case, even if the potential jurors filled the courtroom at the outset, that is not an overriding interest. There are ways that you could address that. You could have additional chairs brought in. And it's not clear whether there were 75 potential jurors there. Whether there was a way of seeking additional people is not particularly clear on the record at the 10E hearing. And here there was no consideration of any alternatives. And there were actually no findings made by the district courts at the time of the closure. The findings that he made came after the fact. So I don't think that the standards were met for justifying the closure during the jury selection process. Counsel, you mentioned the Owens decision. Now, that's true. That was from the District of Massachusetts. But maybe it doesn't matter. But isn't it rather amazing that in light of that decision, the attorneys here would think it was fine to keep the courtroom closed? Owens couldn't be clearer on the proposition that unless the kind of analysis that you've just described is done, you can't close the jury or the public court in the voir dire process. Well, some of the attorneys testified at the hearing that they were not familiar with Owens. Well, they should start reading their opinions. Well, some also testified that they were aware that they couldn't close the courtroom but because of the practice. Well, some attorneys down here didn't. They chose not to speak up. Because they felt that this was the practice here regardless of what the court had said in Owens. And I think that the practice was conflicting. Not speaking up leads to nothing more than plain error. Well, we agree it's plain error. I know that. I'm just saying the problem with them not speaking up is that it makes your job more difficult as opposed to easier to demonstrate what you're saying. Well, I think that we have met the plain error standard of review. I think we have error. It's plain. It affects the substantial rights of the defendants. The problem is the way the district court has set it up. The court has set it up so that because there's a finding of no closure, we have to first find that there was an error. And we have to say that the court clearly erred in its factual findings before we get to whether there was even an error. Absolutely. But I think that if you review the record of the 10E hearing, that you will see that that finding of no closure is clearly erroneous. I'd like to address the exclusion of Mr. Rosario's sister, which is a partial closure. And this court has said that a partial closure has to be justified by a substantial interest. She was the exclusion that we're talking about is the exclusion from closing arguments, which occurred on April 19th. And her exclusion at that time stemmed from an incident on April 14th. But aren't you just arguing that given the disruption that occurred earlier, that you're saying that the court had to, in essence, give her a second chance? Well, first of all, the disruption on the 14th was not while the court was in session. And she... I mean, they actually had to stop the hearing altogether that day. If you watch, there's a video of the 4-14 event that is part of the record. And if you watch that video, I believe you will see that the disturbance that caused the delay of the closing arguments came from the altercation between the Deputy U.S. Marshall and the defendant. And the Deputy U.S. Marshall described it as the defendant coming at him. And then he pushed the defendant, if you watch the video. And as one of the attorneys stated during a sidebar later on, that the Marshall initiated the contact and pushed the defendant. But it was the sister's presence with the kid and the court's response to that that triggered the agitation in the defendant, which then escalated. Yes, but the sister complied with the orders of the court and security officer and the Deputy Marshall. And I suggest that their actions in going over and telling her to go out also suggests that they were controlling who stayed in the courtroom and who didn't. They told her she had to take the children out. Children had been in that courtroom throughout the months-long trial proceedings. She questioned it, yes. But she took the children out and she came back alone. She sat down and she was taught... Wait, the children had watched the rest of the trial? Children had been in the courtroom during other parts of the trial. Because there's another portion of the transcript when the prosecution was going to show some particularly bloody pictures where they brought this up and the person who had a child in there at that time took the child out. But there had been children. And there was no evidence that there was any rule that children under 12 could not be in the courtroom. What then gave rise to them asking for these particular children to be removed? It was their decision. There was no suggestion that the children were rowdy or had made any noise. She was just told to take them out. And she did. And she came back and she sat down and she was talking with other people. Again, courtroom was not in session. And she was complaining. And the deputy U.S. marshal came over and said, you can talk, but don't complain about what we're doing. And it was after that that she was taken out and told to leave again, which she did. And then was excluded, told to leave the courthouse, which she did. And it was after that when she came back on five days later when she was told she could not stay out. Now, she did not, she did not, she complied with the orders, even though she felt that they were unfair. So I don't think it's appropriate to say that she, that it was her precipitation of the incident that justified the court's exclusion rule five days later. And in fact, he simply said, well, the marshals believe that things will go better if she's not here. And they're in control of the courtroom, which also supports the conclusion that they were the ones who were excluding people. And that it simply, he didn't, the court didn't consider alternatives. And there, alternatives were proposed. The defense counsel said, bring her in and admonish her. And there was, and he rejected that out of hand and said, it's up to the marshals and she has to stay out. And I don't think that that rises to a substantial interest. And it certainly doesn't rise to adequate findings to support the exclusion, given the fact that she had previously complied with all of the court's orders. I have 11 seconds left, which I guess I would like to add to the rebuttal. I will. Thank you. Ms. Corey. Good morning. Good morning. Thank you. So I am Allison Corey and I will be very quickly addressing the very important issue of jury taint. There are a few aspects to this issue. Number one, we have three deliberating jurors who admittedly felt threatened and intimidated by members of the defendant's families. Even if the government says, well, one of them said she was more uncomfortable than intimidated. Even if you disregard that juror who did say she felt more uncomfortable under leading questioning by the trial judge, we still have two deliberating jurors who admittedly felt threatened and intimidated. The second part of this is that we have a majority of the deliberating jurors who have heard about these incidents. So they had bits and pieces, maybe they didn't know everything. That's okay. That doesn't diminish the fact that a majority of jurors knew something was going on. But the kicker is, the really bad thing is that jurors lied to the judge when they told him that they had not talked about this, about the incident. And we know that they did lie to the judge under questioning. Maybe they were worried. Maybe they were afraid because they knew they weren't supposed to. But they did lie. And we know this because the other jurors who were aware of these incidences said so. Yes, I heard about the smoking incident. Where did you hear about it? From the smokers. Oh, I heard about the intimidation. You know, they told me that. And I said, hey, they intimidate me too. The problem, the grave problem is that because jurors lied to the judge, we cannot, you cannot accept their claims of continued impartiality. Did the judge do anything more than that? Excuse me? What did the judge do about these claims? Too little, too late, Your Honor. He said the jury shouldn't eat in the cafeteria anymore. You know, they can't go outside smoking. Too little, too late. It didn't cure the harm. Did he give them any instructions about these incidents? Yes, he said, I believe he said to disregard it. It's not part of the evidence. But this is so... He said more than that? Is that all he said? I don't recall. It may very well be. But I suggest nothing could cure this. These were egregious, egregious direct contacts with the jurors. And then the jurors lied. How can we then say, oh, okay, I believe you. You can continue to be impartial. I'll accept that. There is no reporting case that I found that has accepted that. And that the judge... I haven't found any cases that say because the jurors think that somebody's looking at them in a way they don't like is enough for a mistrial either. Intimidation of a juror? Well, you're reaching a conclusion that you've jumped over a few facts in between. They testified they were intimidated. Well, they felt that they were intimidated. That should mean that they were actually intimidated. Semantics, perhaps. If I feel intimidated, isn't that the same as saying I am intimidated? Are you intimidated by me right now? Somewhat. Okay. We should not continue your argument. Your Honor, the district judge made a finding that this was quote, unquote, predictable and harmless. Now, I know I don't practice in the district court here. But this isn't the Wild West, and it shouldn't be treated like one. Juror intimidation should not be predictable, and it is not harmless. You have a three-month trial. You have mountains of evidence. A perfect trial I've never heard of. All that can happen, I think, is that the judge, when these issues are raised, instruct the jury about how they should, unless, of course, you have egregious situations in which there is actually contact between the jurors and some outside influence that is directed at the jurors. I don't see it here. The judge, I suggest, at a minimum should have dismissed the affected jurors. Perhaps not go the whole mistrial as the defendants wanted. But jurors who are intimidated, the defendants have a constitutional right to an impartial jury. And when you have two jurors who are intimidated and lie to the judge, that cannot stand against the Sixth Amendment. It cannot stand. Counsel, we often cite the proposition that when jurors are told to do something, they do it. That's a presumption that we indulge frequently. Why aren't we entitled to apply that presumption here? They're told to disregard something? Because we know they don't. We know that these particular jurors don't follow the instructions of the court because they were told not to discuss the incidences. And they did. We have, that's pretty good indication that they're not necessarily following the instructions of the court. And given the seriousness of the contact in this case, the intimidation and the lying, there should have been a mistrial. This was not an impartial jury. If there are no further questions. Thank you. Mr. Hernandez? Mr. Hernandez, I'm sorry. Yes, sir. I believe you're on. No. Oh. Well, you stood up. That's why I pointed at you. I stood up because you spoke to me. Good morning, Your Honor. Jorge Rivera on behalf of Mr. Luis Rodriguez-Sosta. All right. Your Honor, in this case, we have adopted the three main issues on the brief and on the brief. I'm sorry. Who do you represent? I'm sorry. I represent Luis Rodriguez-Sosta. Thank you. We adopted the three main issues that are discussed in the brief, in the opening brief and our reply brief. I would like to take my few minutes and attempt to address the issues concerning sentencing. And we understand that in this case, the life sentence imposed and the 20-year sentence imposed on count six, which I believe is the weapons count, are procedurally and substantively unreasonable. Starting with the substantive counts three, four, and five, there was a special verdict form for the jury to fill out. And their finding was that for the drugs of crack, crack cocaine and marijuana, as to Mr. Rodriguez-Sosta, basically they put on two of them, they put not applicable, if I'm not mistaken, on the other one, a quantity, but they didn't set an amount. At sentencing, the government raised the issue or explanation to the court that since there was no drug amount determined, that the exposure was from zero to 20. On those three counts, the judge sentenced Mr. Rodriguez to a life sentence without any explanation as to why that life sentence would apply, especially when Statute 21 U.S.C. 841 B.1.C. establishes the default statutory maximum when there's no drug amount implicated or small amount implicated or no amount established. May I continue, Your Honor? Well, your time is up, but I'll give you one more minute. Okay. Then the other issue also sentencing that we would like to address is the fact that the life sentence itself, when one reads the transcript and one reads the sentence report, the court did not specify a reason that would support a life sentence. There was a general explanation, but you can't say what discrete factors or information about the defendant that the court took into account that would support a life sentence. Then as to the drug amount, we understand that the way the computation was done, the court basically took the testimony of one witness, Robles, who claimed that Mr. Rodriguez sold like 20, well, let me rephrase that, 200 baggies of heroin per day and then at night between 50 and 60. The problem with that testimony is that Mr. Robles was there only from June or July of 2007 before they had been out of Puerto Rico for a few years, and then he returned in June of 2007, went back to the drug point on July of 2007, and then by June 2008 he was arrested. In addition to that, he only worked three nights a week selling and then two days daytime. According to the record, the two days that he worked daytime, he did that only for a month, for two months, and the rest of the time basically he was there having a good time and trying to help the other ones, tally. We'll have to take the rest of your argument on your brief. I'm sorry. You're way over your time. I'm sorry? You're way over your time. Okay. Sorry. Thank you. Mr. Hernandez, I think you're on. Good morning, Your Honors. If it pleases the Court. My name is Juan Jose Hernandez. I'm the attorney for Mr. Ramon Maison and Soler. I also, as a brother counsel, I adopted the main arguments that are being argued by Ms. Meisner and Ms. Allison, and after me by Mr. Hernandez. But I do want to take the opportunity to point out a few arguments that we mentioned in our brief. I agree with the Court that there was a very long trial, and it was a difficult trial in terms of time and density. I believe that after taking a look at the transcripts in this case, the record will show that in the end if we take a look at the cumulative error doctrine and apply it to this case, a new trial should be granted. I know that there's no perfect trial, but as we pointed out in our briefs, there are several errors committed by the District Court that if they may be considered harmless independently, they certainly are not harmless when they are looked at jointly. Since the very beginning of trial, as Ms. Allison stated, they had trouble with the jury. Aside from the argument that was presented by Ms. Meisner, which is a structural error, I believe that errors continued going on. For instance, very early in the trial, there was a court-permitted unrelated or testimony of a murder that was unrelated to the indicted conspiracy. That was Fernando Soste, and that was certainly prejudicial and should have not come in during trial. Furthermore, later down the road, it permitted another murder coming in that was admittedly unrelated to the indicted conspiracy, and yet it was permitted under Rule 404B, and it was extremely prejudicial towards their clients. Aside from that specific error, for instance, in many occasions, while cross-examining important witnesses such as Jessica Jimenez and Alfredo Sierra, which were two of the five co-conspirators or persons that were actually there physically, the court basically denied the defendants the right to cross-examine because, for instance, the prior statement had not been provided under oath. This court has already mentioned and decided that that should not be the case and that cross-examination should have proceeded under these circumstances. So I believe that those two errors, there were errors also in provision of late materials that may be understood as constituting Brady-Giegel-Jenks violations, as well as the other arguments that we raised in our briefs concerning prosecutorial misconduct that when looked together definitely go for a determination that it was an unfair trial under the cumulative error doctrine that this court has very well explained in the cases. Thank you. Thank you. Mr. Fernandez, good morning. Good morning to you, sir. Good morning, Your Honors. May I reserve three minutes for rebuttal, if I may? Sure. Thank you, Your Honor. Your Honor, I represent Jose Negro Sostre. I will be arguing on behalf of everyone the issue of jury instructions. However, before I do, I'd like to spend one minute on the courtroom closure that was addressed before by Ms. Meisner. The reason I do this is because I was the one who filed the 10E motion, and I sort of like have this issue very close to my heart, so to speak. I'd like to just point out, following up on the court's questions, to the testimony of Deputy Marshal Portalatin, who during my cross-examination, he said that the courtroom was packed with jurors, meaning that there was nobody else. There was no public in the courtroom except just the jurors, the attorneys, and the defendants. And he went on to say, and I quote, like I mentioned before, we didn't have space, so I didn't have to tell anyone, don't let anybody in, because we didn't have space. The courtroom was packed. That was the testimony of Deputy Portalatin. I would argue to the court that, number one, like the district court said, the public was not present during jury selection, but number two, there was indeed a closure, and it was performed by the marshals down at the district court. Certainly, there was no order by the judge. We are not disputing that, but you could tell by the gist of the testimony from Portalatin. CSO Sierra, who again, during my cross-examination, he said that, number one, he didn't remember anyone, any family member to be inside, and that there was a tendency of excluding, he called it like that, a tendency of excluding family members from WADIR. And I asked him, did you do anything different during that trial, anything different to that tendency? And he said no. Excuse me. Having said that, Your Honor, I'd like to move on to jury instructions. One very quick question. Is it your position that, based on this record, it's clear that the court officers say they didn't exclude anyone, but if any member of the public or a family member had asked them to enter the courtroom, they would not have been allowed to do so? Is that the inference that you want us to draw from this record? Yes. That there was a policy of closure, longstanding, these deputies understood it, and putting aside the white paper over the window issue, that if a member of the public or a family member had asked to enter the courtroom, they would not have been allowed to do so? No. That is exactly right, Your Honor. That's exactly what Portalatín said. And it was so well understood that, according to Portalatín, he didn't have to give any instructions. It was sort of a given, so to speak. And that corroborates the testimony of all the attorneys, of all the witnesses. And even Portalatín said that he himself said, and I could look up the exact quote, that he did not let people come in. It's not only that he told the defendant's family to get away from the window, getting to Judge Torruello's comment. He actually told them, he actually prevented them from coming in. I believe some of the witnesses testified, some of the family members testified, I'm sure one of them did, that she tried to come in, and actually Portalatín said that he stopped her. And he said, no, you cannot come in. All that testimony is cited in my brief, and that's why we think that there was indeed a closure, Your Honor. Just one more, because I know you're ready to get on to your next argument. Go ahead. The Supreme Court has said that there is a duty for the trial judges to consider alternatives to closures. But I'm trying to figure out, and I always wrestle with this when these cases come about, what kind of, does the judge have an affirmative duty when the judge looks around and sees that every seat is taken by prospective jurors to, even if the attorneys don't say anything, to say something that will make sure that we protect the public trial right? The answer is yes, Your Honor, because this is a structural error. And I think the ultimate guarantor, so to speak, of the Constitution is the judge. And if we are talking about a structural error, I think it is up to the judge to make sure that no structural errors occur within his courtroom. I mean, he is the presiding judge. He wears the robe. So yes, Your Honor, he is responsible. And like Your Honor said, I mean, His Honor Bezosa was presiding, he was there. He saw the prospective jurors leave. He saw the courtroom emptying out. And he could not tell that there were no family members there. And he certainly had an affirmative duty to prevent a structural error. But in his defense, certainly neither trial attorneys nor the prosecution alerted him to that. But I think it was his duty to notice. Thank you, Your Honor. Let me move on to the jury instructions. As an introduction, I'd first like to say, Your Honor, the government chose to file this case as one huge all-inclusive conspiracy. And by doing so, the government gets an incredible, a distinct advantage in the case. Well, I want to ask you directly about this, because I think to me this is the crux of the matter. As I understand the instructions, and I'm not going to read them obviously at this point, but the instructions were that they were to either determine whether the proof beyond a reason will now establish the conspiracy in the indictment. And if they found that there's a different conspiracy, they were to find him not guilty. Correct. Why isn't that good enough? That is not good enough for a couple of reasons. First reason, that is the general conspiracy case that is given in all run-of-the-mill conspiracy cases. So if that is a good enough reason, then this court has to overrule U.S. v. Baird, where this court established three specific requirements for the district court to give multiple conspiracy instructions. So if Your Honor is saying that that is sufficient, the general conspiracy requirement is sufficient, then U.S. v. Baird cannot stand. You're saying that another instruction should have been given, whereby if they didn't find this conspiracy, they could find other conspiracies. I would have said that the jury should have been properly instructed. If you go through the transcript, you see from day one, the theory of defense was that there were multiple conspiracies. I mean, I think it's undisputed that drugs were being sold there. But the uncontested testimony of all five government witnesses was that pretty much every owner had complete control of their own business. He hired on fire, he sold, he rented the drug point. Everybody worked, and I quote, independently. Well, okay. I'm glad you brought that point up. Yes, Your Honor. Didn't they use the same runners? Sure. Didn't they use the same? Didn't they have meetings, in fact? Well, for example, my client was never at a meeting. Some of them had meetings, and one of the meetings that was relied heavily by the government was based on a testimony from the first cooperating witness. And his credibility, quite frankly, is suspect, because as Ms. Meisner raised in her argument, it turns out that he wasn't there when the contents of the meetings were discovered. It's very clear that every conspirator does not have to participate in every detail of a conspiracy. So the fact that some are at one meeting and not at another is of no consequence. I understand that, Your Honor. I understand, right. I'm addressing Justice Reyes' comment. But moving on, I think the main point, Your Honor, is that if the defense presents a theory of defense of multiple conspiracies, I mean, I think the defense was entitled for the court to instruct the jury properly to what the defense's theory of defense was. You mentioned Baird. Yes. Now, I haven't read it yesterday, but my recollection is that if there was sufficient evidence to support the indicted conspiracy, a multiple conspiracy instruction was not required under Baird. No, actually, under Baird, with most respect, Your Honor, under Baird, the instruction was given. The instruction was given, but the jury found that actually both instructions were given. The general conspiracy instruction was given, and the multiple conspiracy instruction was given. On appeal, defendants argued that the evidence showed that there were multiple conspiracies, and this court said what Your Honor just said, that both instructions were there. The jury chose one instruction. They chose one verdict. That's the end of the matter. That's the difference between Baird and this case. In this case, instructions were asked, but they were not given. Well, I'll have to read Baird again. Yes, Your Honor. Maybe I do. Do I have 40 seconds left? Yes. Okay. Forty-five. Thank you, Your Honor. Your Honor, I mentioned in my brief that the issue of multiple conspiracies is not something that is intuitive to a juror. I mean, that's a fairly technical defense, and I said jokingly, well, half-jokingly on my brief, that that's something certainly that would have occurred to me many years ago, even though I was a lawyer back then. I mean, that is something extremely, extremely technical. To ask a juror to come up on their own, oh, wait a second. In Alto de Cuba, there were drugs being sold, but there was not one conspiracy. There were actually multiple conspiracies. I think that's a little unfair to presume that jurors can come up with that conclusion by itself, especially when other conspiracies show their head on trial. For example, the conspiracy in La Trocha. There was evidence about another conspiracy in La Trocha who even set up a drug point in Alto de Cuba and operated it. The only problem I have with it is maybe it's not a technical problem. Maybe I'm going off the wrong track in the law. It seems to me that you actually receive the benefit by the instruction, because if there had been a multiple conspiracy instruction, your clients would not have a leg to stand on at this point. True. Well, in fact, if the jury only could center on the single conspiracy, they didn't find that, then there was a not guilty verdict that should have been rendered. My contention is that that could have happened if they had been properly instructed. Your Honor is correct that had the court given the multiple conspiracy instruction and had a guilty verdict been issued, been answered, I would not have a leg to stand up on appeal. But that's my job as an applicant. But how are you prejudiced by the single conspiracy instruction? Yes, Your Honor. I am prejudiced by the conviction itself. I am prejudiced because I was convicted without the jury being properly instructed on what was my theory of defense. There is my prejudice, Your Honor. And I think that's very serious. I think that's a very serious prejudice. I mean, not that. And I mean it from a legal standpoint. Not just because, you know, my clients were convicted and that's prejudice per se. Taylor, won't you, if I might, pursuant to the instruction that the judge gave, I assume you argued to the jury the very point that you're making, that the evidence does not support a conviction for the conspiracy charge, that in fact there were other conspiracies that may have been shown by the evidence here. But those don't count. So you were able to make the very argument that you're advancing. You were permitted to make that argument to the jury, were you not? Well, the trial counsel- I'm sorry. Excuse me. Yes. I did file the 10E motion and I had some delays in this report. But trial counsel certainly had that opportunity to address the jury during closing arguments. But jury has to follow the judge's instructions, not the- Well, as Judge Cholet has pointed out, those instructions told the juries that the state has to prove that they were guilty of the conspiracy charge. And if defense counsel is arguing that the evidence only proves a different conspiracy, they'll surely understand that that doesn't work under the instruction that was given.  Well, it depends. The answer I would say respectfully is no, because as trial counsel can argue to the jury, there was a different conspiracy that is not the one charged in the indictment. But now without the judge's instructions, what conspiracy are they thinking about? Are they thinking of la brocha? Do they really understand that each drug owner had a different conspiracy, that that could happen, and that had legal significance? Please remember, I'm not arguing sufficiency of the evidence. Okay? I'm not making that point. There was certainly- I mean, I could not meet that standard here. I am just saying that under the standard set in Baird, the defense was entitled to that instruction. That's all I'm saying. And if you look at the evidence in the light most favorable to the defendant, we meet the standards in Baird. I mean, that jury should have been properly instructed to say, if this applies, if the defense was able to prove all these elements, then you should consider multiple conspiracies. And if you find that there are multiple conspiracies, you have to acquit. That is very different from counsel making arguments to the jury, in closing arguments. Yes, Your Honor. Thank you so much. Good morning. My name is Olga Castellon. I'm an assistant United States attorney. And I was one of the prosecutors who tried the case before the district court. I'm going to start arguing the juror misconduct, which were several incidents that happened at the onset of the trial. I believe that these incidents that are referred in the defendant's brief to the court can be described as three separate incidents. One was at the very beginning of the trial, in which one of the family members complained that the jurors were discussing the case. And the court took measures immediately to call in these members of the jury. And in camera, there was this interview conducted. And appellant's attorneys were present and were able to actually pose questions to the court in order for the matter to be addressed. And the court made a determination that there was no discussion among the jurors, but they were instructed vehemently by the court not to do so and also to not discuss what had been the discussion in camera. Then the second incident, in which the person who came forward with the discussion and the claim and the allegation, which is one of the defendant's wife, then was involved in the second incident. And this is the cafeteria incident that is related today to this court by Ms. Currie. And in that particular incident, one of the jurors mentioned that she had felt that these people were looking at them and that they felt uncomfortable. And at some point, the court did, in fact, conduct the interviews in the presence of the attorneys. And they were allowed to ask questions. And this is when the whole jury panel was interviewed, that the court is coming to the knowledge that, in fact, there were several individuals that had some knowledge of the incident. The court made the determination that there was no such discussion among the jurors as to what had been the discussion, but some of them were part of the first incident and some others were, they thought that something had happened because some of the members of the jury panels were called into the judges' chambers. And the court did take measures. And the court, instead of granting... They were a little bit more specific. They had more specific knowledge that they reported to the judge that something had happened. They knew that something specific had happened. But doesn't that get to counsel's argument that the jurors who were instructed not to discuss it, in fact, discussed it with some of the other jurors?  And the members of the jurors who, in fact, discussed this matter, in which the court made a determination that there were jurors number 30, 31, 33, which were the ones in the smoking incident, and the other ones, they had even mentioned that they were called in, but there was no specific discussion as to what had been discussed. But even so, the court instructed them at the very onset of the trial that to not discuss the matters that were discussed in camera and do not discuss the case with anybody prior to deliberations. And the court did take steps further to control the jury because the court made a finding that there was no such thing as a jury tampering in the incident in the cafeteria. And the court did take that any feelings that the jurors may have stated, that they have felt, that they were very categorically emphatic that that did not prevent them from rendering a verdict that was fair in the case. So the court did take measures to control the way the jurors were going to approach the courtroom, the way they were going to take their lunches, or the way they were going to actually be assembled in the courtroom. And aside from those incidents, the court did take the appropriate measures in order to avoid the declaring a mistrial in the case. And those measures were the correct ones due to the circumstances that there was no actual taint, there was no specific intervention that might lead the defendants to understand that there was an actual prejudice by the incidents that happened in the cafeteria. So if there's not any other questions, I will move to the other subject, which is the one that was brought by Ms. Misner and Mr. Inez Fernandez in terms of the closure of the courtroom. And this was a matter that was discussed in the evidentiary hearing, and certainly the court had the opportunity to listen to the testimonies to not only the family and the friends of the defendants, but also the opportunity to listen to the attorneys and their explanations of why they remained silent and basically waived any possible claim that the courtroom was closed. And even the court not only noted... You just said waived any possible claims of a closure? Are you actually arguing that they're not, even on appeal, they're not entitled to argue the closure issue at all? Well, the truth of the matter is that the trial attorneys, the five trial attorneys who were representing the defendants at the time, remained silent and at no point during the jury selection gave any indication to the court that the family members were not present in the courtroom. If it's a structural error, can it be waived? That is correct, Your Honor, but we contain, and the government contains, that there was no structural error because there was no such closure. I ask you, if it is a structural error, can it be waived? No, Your Honor. All right, so waiver is not an issue because that's what they're claiming. Well, maybe we didn't say that. We didn't use the correct word, but they did remain silent. Does it make any difference if it's a structural error? That is correct, and under Owens and under Presley, we understand that they had also the right to bring that to the attention of the court, and they decided not to do it. Well, the U.S. attorneys should also have brought it up to the court. Yeah, but that was a situation that nobody was aware of, the fact that family members were not even present, because we're talking about the beginning of the trial. The family members were not even identifiable by the court, so there was no way that the court could identify that. Of all the people who were present in the courtroom, there were certain individuals that were family members or they were friends or they were just merely members of the public that were inside the courtroom. But there was a – There were no seats, and there was a testimony that has been presented to the court that Porta Latina, Deputy Marshal Porta Latina, stated that at some point there were no seats. But there's also evidence in the record that as the jurors were being interviewed and they were being dismissed for cause, they were being allowed to exit the courtroom. Right. Before we get to the jurors beginning to exit, when jury selection began, there were no seats in the courtroom, wasn't it? And it seems from what I've read that it's apparent that everyone knew that every seat was being occupied by a prospective juror. Seems to be that that was a situation at some point due to the testimony of the Deputy Marshal, that the courtroom was full at some point and that there was no seat available. But immediately thereafter, as – So does the judge have an obligation at that point to make seats available for the public, to make an inquiry? And as has been argued, the court can make the inquiry, but if it's not put to the attention of the court at the time that there are no seats available and nobody is put in that situation under the court's attention, at the time maybe the court is handling other matters and he was not a part of the situation. But, counsel, having been a trial judge, one thing I know is the judges got the best seat in the room to observe what's going on, including whether all the seats are taken. That is correct. But I understand respectfully that at the time maybe, and this happening at the beginning of the trial, that maybe he could not have the means to identify which members were members of his jury veneer and who were just members of the public because there's also a situation. There's only four individuals that have claims that they were not allowed, but there was no, being the fact, and there's a judicial determination, that there was no actual closure, that the courtroom was closed. Counsel, Owens was written in 2007. We're in 2010 when this trial takes place. I mean, doesn't, pursuant to an argument that one of opposing counsel made,  and in light of what apparently was a longstanding practice here in Puerto Rico to make sure that that practice wasn't continuing, and that when Vardir is taking place that there is room for members of the public. There is room for members of the public, and if there can't be room, there's got to be some good explanation on the record for that. Isn't opposing counsel right that the judges had an obligation to see that that was happening? But in this particular case, there was no indication that the court was surprised that there was no seat available. Well, what about Judge Thompson's point? The judge can see that, right? Yeah, there is their obligation, obviously, for the court to take the measures at the time, but at that particular time in trial, when there's no allegations that nobody has been coming in, and the testimony, because we have to disagree with counsel's statement that Deputy Marsha Portaldin did, in fact, say that no one was allowed to go in. He just stated that maybe momentarily, at the beginning of the day, there were no seat available, but there was no statement from the witness that stated that then there were not people going in or that their family members were forbidden to enter into the courtroom. And there was no allegation, and there's one in the trial transcript, there's one claim from one of the attorneys requesting from the court that the court be sealed. So it's contradictory from the allegations of the defendants that they were not at any point during the day were not allowed to go in when, in fact, there's one of the attorneys stating that he was the one who's proposing to seal the courtroom. Isn't there also another case from this circuit in this district after Owens, which was the same issue involving the Rio Grande dumping? That was the case in the Agosto Vega case in which the district court even... What year was that case? 2011, 2010. About the same time this case was being tried. Yes, but I understand that that decision came after this trial was held. I might be mistaken, but I think that the Agosto Vega decision came after this case was tried in the district court. But as to the so-called long-standing rule that not to allow the family members or members of the public in the voir dire, the defendants and the attorneys doing the evidentiary where he could not present additional evidence aside from that claim, which was vague that it was the usual practice and certainly has been raised before this court that public has been excluded, but there was no indication that that was an order issued by the court whatsoever that was followed by the district court and the different judges in this district. Because by saying so, and these attorneys were asked if they were familiar with the Presley case and they were familiar with the Owens case and that they knew that they had the right to, if that was the situation at the time, and if taken as true what the family members stated, that they had come forward to them and stated that they were not allowed, that they had the right to claim that before the court. And they said that just because a practice, they decided to choose a practice over a constitutional right. So making that set of determinations and the questions posed by counsels and the witnesses' response in which we have to include that Mr. Sena, one of the attorneys, he denied being approached by a family member, even so she stated that she had approached him. So making the credibility determinations, the court made the finding that there was no such ruling for a closure in the Guardia in this case. So as to the Rosario's partial closure, partial closure being the fact that she was excluded from the courtroom while there was an incident prior to the closing arguments in which the court was not in session, but the marshals who are in charge of controlling the operation of the courtroom and the decorum of the courtroom thought and felt that Ms. Rodriguez's attitude towards the authority who controlled the order was totally breached and she had total disrespect for the court personnel who was in charge of the safety and the decorum of the courtroom. And the incidents, even though there had been a mention that there was a video that depicts what happened and the events that transpired that day, certainly the video is silent as to the way that Ms. Rodriguez behaved. And not only the actions that she took, it was the fact that she approached the marshals to intervene when they were trying to control one of the defendants who got agitated by what was happening in the courtroom. But also the way she addressed the marshals, the tone of disrespect that she used in order to address the marshals, it's the fact that then five days later, and it's five days later because the court had to stop the trial for those five days because several attorneys and one of the defendants had to receive attention because they got upset by the whole situation, that it's the next court date, it's the day of the closing arguments. So it's immediately thereafter that she shows up to the courtroom and even the attorney that was representing Rosario at the time did accept that she did not behave properly. And even though he posed the excuse to the court, the court then deferred the judgment to the marshals because they were the ones who actually had to address the situation and her behavior. And the court did take measures and contemplated possible alternatives, but one of those alternatives were the ones that were recommendations by the marshals and therefore she was excluded. And the defendant had failed to state to the court, in this case, what was the prejudice that he received by Ms. Rodriguez not being allowed to go in when the closing arguments were held on April 19th. So if there's any questions regarding that particular incident? Just quickly, just back to the jury closures, are you in a position, you're an active trial attorney in the U.S. Attorney's Office, what is the current practice with respect to the handling of the voir dire here in the District of Puerto Rico as to the participation by the members of the, opening the courtroom to members of the public? I understand respectfully that there are measures taken by the courts in every single trial that I've tried to make sure that the public is present in the courtroom. And I can say that with all candor to the court, that that has been the practice. And I understand that the case of Presley and the George case and also this court's decision in Arbol Saavedra was really clear as to the instructions that the district courts they must follow in terms of the right of the public to be present in the public trial and the reasons that are underlined for that commandment. Thank you. So the defendants, several defendants, they appeal their sentences and their arguments in terms of reasonableness and also substantive errors in determination and in imposing the sentences in this case. Four of the five appellants before this court received live sentences and defendant Negron was sentenced to the minimum term that he could have been, even though the court made a finding that he was reasonable foreseeable for him to be exposed to a higher amount of drugs. The court did, in fact, went and downward on the guidelines recommendation and sentenced the defendant to a 20-year imprisonment. But the defendants have failed to state how these calculations made by the court had affected them and substantively were erroneous. And we have to note to the court that this particular conspiracy involves not only the distribution and that's the finding of the jury in this case that there was one conspiracy and the five defendants were found guilty of the count one, each one of them. Well, Counselor, if the evidence supports, there's sufficient evidence to support the defense's theory, it shouldn't be given to the jury. Are you saying that there was no evidence that could support a multiple conspiracy at large? And if there was, isn't the court obligated to so instruct the jury? Okay, so we're going to the instruction now because if we are discussing the multiple conspiracy instructions, if the court understands, and as the district court did in this case, that there was no evidence of a multiple conspiracy and that was just a theory of the defense but was not supported by the overwhelming amount of evidence that was presented throughout the trial, the court can deny the defendant's request for that instruction. And the court did, in fact, instruct the jurors when they charged them that the law of the conspiracy I'm trying to figure out, there was certainly evidence that these folks operated independent of one another. So are you saying that there wasn't substantial evidence to support multiple conspiracy theories? I understand respectfully to the contrary that there was ample evidence that sustained the existence of one conspiracy. Counselor, let me try it one more time. We understand that there could be an argument that there was one conspiracy and that there was evidence that could support a one conspiracy theory. The question is, was there also evidence that could support a multiple conspiracy theory? But that the multiple conspiracy theory was not supported by the evidence. All right, so that's the government's position. It was not supported by the evidence because if there was the proof that there was a common goal and there was overlapping and interdependency among the participants and the overall plan in this case, and there was ample evidence not only by the videos and the interventions and the testimony of law enforcement that all these individuals were dispensing, distributing, selling drugs at the same location and for the later part of the conspiracy was at one specific location, one street, one separate point in which all these brands were sold at the same time and there was a complex hierarchy but there was also a complex determination of how that drug particulate corner was going to be run. And the multiple conspiracy request and theory was based only that each defendant was an owner of a different brand. And the court made a determination that just by owning a brand not necessarily creates the multiple conspiracies because the rest of the evidence, the entirety of the evidence supported that there was the overlapping of the participants, that they were using the same sellers, that sellers were distributing not only the heroin but they were also in charge of distributing the cocaine, that they were following the owners because in this case all the appellants were identified as drug point owners, that they were deciding the shifts that they were going to work and the lookouts who were working at the drug point were being paid by the sellers who in turn were being paid by the owners themselves. And they explained, and we take objection for example to Mr. Fernandez's argument that his client was not even mentioned in the meetings and we refer back to the trial transcript and the testimony of Jesus Robles that identified Mr. Fernandez's client as being one of the participants in those meetings. He only did not use the name Jose Negron. He did identify him by his nickname on the street. He said Nimas. And there's a three-page testimony of how Mr. Fernandez's client was present in those meetings. And those meetings were part, an intrinsic part, an important part of how this case and how this conspiracy case was presented because if meetings are held among the owners of the different brands and decisions are taken by the group of individuals and they're using the same place, regardless of what they own, it's a simple conspiracy. And that was what the jury, when they received the charge, they were instructed to do so. And they were instructed that if they found that the defendants to be a judge separately and independently, that was one of the instructions. And secondly, that if they found that they were part of another conspiracy, that they had to be acquitted. And it was, I understand and I, from the top of my head, can think that the court admonished the jurors maybe two or three times about the same thing. So I respectfully understand that there was no error and there's no prejudice posted to the defendants by the fact that the specific proposed jury instruction as to multiple conspiracy was not given to them. Those are two separate points, whether there was error or whether it was prejudicial. What standard should a district court judge apply in deciding whether there is enough evidence to justify an instruction? I think a moment ago you said the evidence had to be overwhelming. That can't be right. Well, if the court makes a determination, and I respectfully, but I think that there was insufficient evidence to support, to give the instruction that was requested, and the court makes the finding that there is insufficient evidence to support that theory of the defense, the court can deny the instruction and charge due duly according to the instruction that the court deems appropriate at the time. If there's no other questions as to that matter, I would like to move then to the argument of the prosecutorial misconduct, which I know is going to be addressed by Ms. Misner. In the panel's brief, there's a claim that the prosecutor engaged in prosecutorial misconduct specifically when the testimony of Alfredo Sierra Garcia was presented, and because the testimony was contradicted by a video that was taken during the investigation of the case, and that what the witness related to the members of the jury was not what was reflected on the video, and the fact that the prosecutor did elicit that testimony from the witness, and particularly to the presence of Guisrelo Rosarios Rivera. And certainly there was no claim or objection, so the review in this case respectfully we understand that it's for clear error, and it's our position that there was no such misstatement of Alfredo Sierra Garcia's testimony. We are referring that this video that is referred in the allegations made by defendant was presented to the jury, was even though several portions were played when the direct testimony was being carried out by the prosecutor, the witness had related to the members of the jury what had happened. Not only his participation in the conspiracy, not only that he had knowledge of who were the participants, including the defendant Guisrelo Rosarios Camacho, but also he was related to an incident that happened on February of the year 2008. And when he's relating to the incident, he identified that Guisrelo Rosarios was present on that meeting, and he further explained that Guisrelo Rosarios had been one of the individuals who went up the hill to conduct a meeting with one of the co-defendants in the case. The video was played, and the witness testified, and he was asked specifically what the video depicted, and he explained to the members of the jury what was depicted on the video. And in that particular portion where the video was presented, Guisrelo Rosarios did not appear on the video. And there has been allegations that the government knew that that was false testimony, that the co-operating defendant was not in fact present during this incident, when in fact he did testify as to it, and that later on during closing arguments, the government did misstate the evidence and did say, or contrary to what was represented in the video, argued that Guisrelo Rosarios Camacho was present and that he was going up the hill. The fact that Guisrelo Rosarios Camacho did go up the hill or came down the hill is something that is immaterial to the guilt of the defendant, Guisrelo Rosarios Camacho, because there was overwhelming evidence during this trial that he was a participant and that he was an active member of the conspiracy, and there were several incidents that were related not only by Alfredo Sierra Garcia, but by other co-conspirators who identified Guisrelo Rosarios Camacho as being the owner of the crack cocaine in Altos de Cuba. So clearly the mention of the incident and taking into context the fact that the closing argument lasted almost a day and extrapolating just the misstatement maybe or the confusion that you can see the video and he went up the hill, that cannot amount to the fact that defendant's rights were violated and there's substantial prejudice outweighing the fact that there's overwhelming evidence against the defendant. The prosecutor, when making reference to the video and it was in rebuttal in response to the defendant's attorneys, complete argument as to the video and the absence of Rosarios Camacho in the video and inviting the jury to make their credibility determination as to the witness testimony. The prosecutor stated what the witness testified during trial and not only did that, but invited the members of the jury to watch the video in its entirety and to make their own determinations as to credibility and their defendant's participation in the conspiracy in light of the testimony of not only Alfredo Sierra Garcia, but also as to Jesus Robles Santana. Both of them testified during trial. Both of them had the opportunity to be cross-examined by the defense and so it's a contention of the government and respectfully that this court finds that there was no prosecutorial misconduct on the government's part. As we were explaining briefly before, defendant's sentences were procedurally and substantively solid in terms of the court made the individual findings as to each defendant and the court was very cautious in making determinations as to the drug quantities that were attributed to each defendant. Because in this case, the jurors, they had the opportunity to vote on the amount of drugs and as was stated by one of the attorneys, I cannot recall who addressed that to the court, that there were some instances in which the jury verdict form had a space in blank in which the jurors made no determination as to what was the amount of drugs that were proven to them beyond reasonable doubt. And as to that particular matter, the court did take, in fact, the drugs that were attributed that each defendant had control over at the drug point. So if the evidence at trial proved that Wilfredo Rosario Camacho was the drug point owner of the crack cocaine, in spite of being found guilty as to the different set of drugs and narcotics that were charged in the indictment, which is over one kilo of heroin and over, at the time, it was charged at 50 grams or more of crack cocaine, the court did, in fact, sentence Rosario Camacho as to the amount of drugs that were attributed to him and for the time frame that the witnesses had testified that these individuals were participating in the conspiracy. And the court was very specific that as to each calculation, the court was using the lowest amount of drugs that could be attributed to each defendant and the lowest amount of drugs that could be found in each of the control substances that were seized and were later on presented to the jury as to what was contained, for example, in each bag of cocaine or each crack vial. So when the court made the calculations, it was very specific that it was using the lowest amount of drugs and all these calculations yielded for penalties that carried on a minimum of 10 years and maximum to life. So life imprisonment was one of the sentences that the court could, by mandate of the statute, that could be imposed as to each defendant. And the court did, in fact, decide the reason in the Statement of Reasons why certain sentences were imposed as to each defendant based on the fact that the defendant's role and enhancement were added as to defendants that firearms conspiracy or firearms enhancement were proven because the court did make reference to the record as to why certain enhancements were applicable, including the leadership enhancement or the firearms enhancement. So it is the government's contention that the convictions should be affirmed and the sentences should be affirmed also as to they were reasonable and substantively and procedurally were sound. Thank you. Prior, I would just also like to add that to the evidentiary rulings that have been argued and they have been requested for review, the standard of review, if you have the use of discretion. And certainly there are two that have been pointed out. One was the death of Rolando Sostre Miranda. And during the trial, not only the testimony was relevant, but it was intrinsic to the matter that was presented in the case. And in fact, that particular reference to that murder, it was only for the purpose of establishing how Guistero Rosario Camacho became the drug point owner in Galtos de Cuba. And the jury were instructed, and we have to presume that the jury followed the instruction during the trial, that none of the defendants who were tried were charged for that murder, that none of the defendants were, in fact, that this murder was not in furtherance of the conspiracy, but only to take it to consideration for a limited purpose of examining one witness testimony. As to the evidence of the murder of El Boxeador, it was also a very limited reference and it was addressed by two witnesses who testified that an individual had been killed at the drug point in Galtos de Cuba for owning a $10 debt. And the reference was passing by the fact that one of the appellants did, in fact, say that El Boxeador was seen carrying a gun on that particular day. No additional evidence was presented as to the details of the murder in that particular testimony. As to the allegations that it was improper admission of evidence because the witness did, in fact, read from the recollection from a document, the court made a finding that that was not the issue, so that should be denied. And last, and if there's no additional questions, we are going to render the rest of the allotted time to this court, is that there's overwhelming evidence that there was one single conspiracy in this case, that the defendants, each one of them knowingly and voluntarily participated in the charged conduct, which was the conspiracy, there were also substantial and overwhelming evidence that they also engaged in the aiding and abetting of the principals who were the ones who were carrying out the drugs into the commission of the offense, the substantive offense. And the firearms, the ones who were found guilty for conspiring to possess firearms during furtherance of a drug trafficking crime, that those convictions should also be upheld because there was ample evidence of several incidents in which each defendant who was found guilty in this trial was identified as persons who carried the firearms and were in the use of firearms in order to protect the business of the drug trafficking in this location. Thank you. Thank you. Good afternoon. Good afternoon. It will be a good evening soon. In terms of the decisions, the dates of decisions, Presley was decided on January 19th of 2010, which was the day before the jury selection. Augusto Vega was decided on August 18th of 2010, which was many months afterwards. Going to the court's findings, that no specific evidence was ever presented, however, that demonstrated this supposed long-standing district policy of not allowing the public into the courtroom was ever followed. I'd suggest there was specific evidence. You had four people who testified they were not allowed in. And in Deputy Portolatine testified, and this is in Volume 3 of the appendix at 286, I believe. He was asked, I believe you testified on direct that you, at one point, had to tell some people to move away from the door. From the outside, yes. Question, those were people who were not jurors. Answer, yes. And were those people who were attempting to enter the courtroom? Answer, they would stand by the door to look inside. Question, and they were not allowed to come in? Answer, no. So he did testify that he did not allow people to come in. And Deputy Sierra also testified that he recalled nothing contrary to what he had described as his tendency to keep people out. He referred to the policy of exclusion as a tendency. Neither he nor Portolatine ever denied keeping people out or telling people to stay out. They simply did not recall anyone coming in. They did not specifically say, we did not, and not specifically but, the testimony of the people who said, we asked to come in and we were told we couldn't. Now, both Judge Lopez and Judge Thompson have asked whether there is an affirmative obligation on the court to do anything. And I would suggest that if the court, particularly after Presley and Augusta Vega, but even before that, after Owens, that the court does have an obligation if it looks out and sees that all of the courtroom is full. And the court found that it was full with prospective jurors, not with anybody else, that could you have a few additional seats brought in, chairs brought into the well to allow at least some people to be in there at the beginning. And should the court have instructed the marshals, the court security people, to let people come in, to tell people that they could come in when prospective jurors who had been dismissed were leaving. So there are steps that the court could and should have taken in order to allow people to come in. In terms of whether there was any kind of waiver by counsel, I don't, Augusta Colon and Christie, where this court found waivers, were cases in which the district court had directly addressed the attorneys about a particular procedure or proceeding, and they had remained silent. I think we are under just plain error review here. All of the attorneys testified that there was no strategic decision or tactical decision not to do anything. It was just simply they felt that this was the procedure of the court and they were going to follow it. In terms of the misconduct argument, I would like just to suggest to the court that they should take a look at the video of the incident and the court and the prosecutor's closing argument in which the specific rebuttal argument specifically talking about you saw Rosario Camacho going up the hill. This meeting was important because it was the only piece of testimony that the government was arguing was corroborated by something other than the witness's testimony about Rosario Camacho's role or leadership or participation in this organization. There were no drugs or weapons that were seized from him. There were no undercover buys made from him. He was not identified in any drug transactions on the video. So this was an important piece of evidence in the government's efforts to make him part of the overall conspiracy that they charged. Thank you. Okay, good. I wasn't sure if I had time. You already used it up. I know. So I'll use one metaphor. I don't want to test the court's patience, certainly. I just want to address pretty much one point that my sister said regarding, I believe, what I understood from my sister's argument is that the district judge found that there was no evidence to support a multiple conspiracy theory of defense. I would like to direct the court's attention to docket number 3010, which is the opinion and order issued by Judge Bezosa denying all defendants' motions for judgment of acquittal. And on page 14, specifically talking about the defendant's theory of defense, the judge says, and I quote, although such evidence may support the defendant's theory, the evidence in this case is adequate to permit a reasonable trial of fact to have found a single conspiracy being a reasonable doubt. So the point is, even Judge Bezosa said, I think getting back to Judge Thompson's point, there was indeed evidence to that effect. And I think Judge Rivas asked, what was the standard? The standard is viewing the evidence in the light most favorable to the defendant. Viewing the evidence on that light, was there any evidence to support the requested instruction? Because I took so much of my time, I will not take any more. Thank you so much. Thank you.